**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMMI JONES,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>AIG RISK MANAGEMENT, INC., *et al.*,<br><br>　　　　Defendants.<br>_____/ | No. C-10-1374 EMC<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE**<br><br>**(Docket Nos. 70, 71)** |

　　　　Pending before the Court is Defendants National Union, AIG, Inc., and Chartis Claims, Inc.'s (collectively "Defendants") Motion to Strike three portions of the Third Amended Complaint (Docket No. 71). Also before the Court is a Motion to Dismiss filed by Defendants AIG, Inc. and Chartis Claims, Inc. (Docket No. 70). Having considered the papers filed in support of and in opposition to each motion, and having heard the arguments of counsel at the April 13, 2011 hearing, the Court **DENIES** Defendants' motion to dismiss and **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to strike.

### I.　FACTUAL & PROCEDURAL BACKGROUND

　　　　In her third amended complaint ("TAC"), Plaintiff Tammi Jones alleges as follows.

　　　　Plaintiff was employed by Tutor-Saliba, a California construction firm working on the Richmond Bridge. *Id.* ¶ 9. On May 24, 2004, while driving a company vehicle down Highway 580, Plaintiff was rear-ended by a third party, Saengpheth Phimphavanah. *Id.* ¶¶ 9-10. Plaintiff sustained injuries to her cervical spine, right shoulder and right upper extremity as a result of the collision. *Id.* ¶ 12.

Tutor-Saliba purchased insurance coverage for the Richmond Bridge construction project from Defendants. *Id.* ¶ 9. National Union provided insurance coverage to employees of Tutor-Saliba driving company vehicles with permission in the course and scope of their employment, for up to $1,000,000, less any amount recovered from the responsible party. *Id.* The policy was in effect on May 24, 2004, when Plaintiff's accident occurred. *Id.* ¶¶ 9-10.

Plaintiff received worker's compensation benefits through Tutor-Saliba from AIG as a result of the collision and, on February 18, 2005, Plaintiff filed an action against the responsible party, Saengpheth Phimphavanh, for damages resulting from the collision. *Id.* ¶ 12. The action against Saengpheth Phimphavanh settled in early 2006 and Plaintiff received $25,000. *Id.* ¶ 13. However, Plaintiff's damages were greater than the combined total of the $25,000 and her worker's compensation benefits received. *Id.* In January 2006, Plaintiff's counsel filed a claim for underinsured motorist ("UIM") benefits with Tutor-Saliba. *See id.*

Deborah Paules, who Plaintiff alleges is an employee of Defendant Chartis Claims, Inc., responded to Plaintiff's counsel concerning the UIM claim. *Id.* ¶ 15. Plaintiff alleges that Defendant Chartis Claims, Inc. sold insurance and handled adjusted claims on behalf of Defendants. TAC ¶ 15. Plaintiff's counsel advised Ms. Paules that Plaintiff would be able to provide a settlement proposal of the UIM claim after conclusion of the worker's compensation proceeding. TAC ¶ 15. Plaintiff's worker's compensation proceedings ended on November 2, 2006, and Plaintiff received $108,162.22. *Id.*

Plaintiff submitted a settlement proposal to Defendants on December 7, 2006. *See id.* ¶ 16. This is the date in which the delay in processing of Plaintiff's claim began. Before this time, Ms. Jones's claim could not be settled because her worker's compensation benefits were to be credited toward her UIM benefits. *See id.* ¶ 15.

In her settlement proposal package, Plaintiff requested the amount of $850,000, the remaining policy limit under the UIM policy. *See id.* ¶ 16. Plaintiff remains disabled as a result of injuries sustained in the Richmond Bridge collision. *Id.* The settlement proposal package was submitted to Ms. Paules. *Id.* Plaintiff requested a response within thirty days, but Ms. Paules provided no answer for over two months. *See id.* ¶ 17. After repeated phone calls and letters, Ms.

Paules told Plaintiff's counsel that she was referring the file to Defendants' outside counsel, Dennis Babbits. *See id.* ¶ 18. However, after seven months, Mr. Babbits had not received Plaintiff's file and Defendants had not taken any action on the claim. *See id.* ¶¶ 22-23. Throughout this period, Plaintiff's counsel sent numerous letters to both Ms. Paules and Mr. Babbits, explaining that Plaintiff remained disabled and out of work and was suffering financial hardship and emotional distress due to the delay in handling her claim. *See* ¶¶ 20-22.

In August 2007, Mr. Babbits advised that Defendants wanted Plaintiff to undergo a medical examination within the next few weeks; but scheduled it for October 16, 2007. *See id.* ¶¶ 23-24. This was to be followed by a deposition of Plaintiff, set for January 3, 2008. *See id.* ¶ 24. Mediation failed and, in March 2008, Plaintiff requested arbitration. *Id.* ¶ 25. Although Plaintiff had asked Mr. Babbits to select an arbitrator as soon as possible, he did not respond until May 2008. *See id.* The arbitration was set for October 2008, and then pushed back to November 2008. *See id.* ¶ 30.

On November 12, 2008, the day before arbitration was set to take place, Defendants offered Plaintiff $450,000 to settle the claim. *See id.* ¶ 31. Defendants agreed that the settlement did not cover any claims Plaintiff might have regarding Defendants' handling of her UIM claim, so she accepted the offer that day.[1] *See id.* However, Defendants then notified Plaintiff that they would not pay the $450,000 unless she released all claims. *See id.* ¶ 33. When Plaintiff refused and requested a rescheduling of arbitration proceedings, Defendants relented. *See id.*

Plaintiff signed and returned the release, only for the handling of the UIM claim, on December 3, 2008. *See id.* However, Defendants continued to delay payment and Plaintiff did not receive a check until January 26, 2009, over two years after she first provided Defendants with her settlement proposal. *See id.* ¶ 38.

Subsequently, and consistent with the parties' settlement agreement, Plaintiff initiated a lawsuit against Defendants challenging the way that Defendants had handled her UIM claim. The suit was filed in state court but was thereafter removed here. Following this Court's rulings on prior

---

[1] Presumably, this was an oral consent to the offer, as Plaintiff later sent in a written release for only the UIM claim. *See* TAC ¶ 33.

3

motions to dismiss (Docket Nos. 43, 44), Plaintiff filed a second amended complaint and then the TAC in which she asserts: (1) breach of contract, as to National Union, (2) tortious breach of insurance contract, as to National Union, breach of the duty of good faith and fair dealing for punitive damages, as to National Union, (3) intentional infliction of emotional distress, as to all Defendants, (4) conspiracy, as to all Defendants.

## II. LEGAL STANDARDS

A. Rule 12(b)(6): Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint, facilitating dismissal to the extent the pleading fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The pleading is construed in the light most favorable to the non-moving party and all material allegations in it are taken to be true. *Sanders v. Kennedy,* 794 F.2d 478, 481 (9th Cir.1986). However, even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986) (internal brackets and quotation marks omitted)). Hence, the Court need not assume unstated facts, nor will it draw unwarranted inferences. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009) ("Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").

To survive a Rule 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully" such that the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937,

1949 (2009) (citing *Twombly*, 550 U.S. at 556). "When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted). In sum, if the facts alleged foster a reasonable inference of liability – stronger than a mere possibility – the claim survives; if they do not, the claim must be dismissed. *See Iqbal*, 129 S.Ct. at 1949-50.

B.   Rule 12(f):  Motion to Strike

Under Rule 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (internal quotation marks omitted), *overruled on other grounds*, 510 U.S. 517 (1994). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Id.* (citation and internal quotation marks omitted). When ruling on a motion to strike, a court views the pleading under attack in the light most favorable to the nonmoving party. *See RDF Media Ltd. v. Fox Broad Co.*, 372 F. Supp. 2d 556, 561 (C.D. Cal. 2005). Courts generally disfavor motions to strike because striking is such a drastic remedy. *See Stanbury Law Firm v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000) (stating that "striking a party's pleadings is an extreme measure, and, as a result, we have previously held that 'motions to strike under Fed. R. Civ. P. 12(f) are viewed with disfavor and are infrequently granted'").

### III.   DISCUSSION

A.   Motion to Dismiss

Defendants AIG, Inc. and Chartis Claims, Inc. ask the Court to dismiss the Third and Fourth Counts of the TAC on the grounds that those counts fails to state a claim for relief as to each of them.

1.   Count III:  Intentional Infliction of Emotional Distress

The elements of a cause of action for intentional infliction of emotional distress ("IIED") are as follows: "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of

the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress." *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148, 155 n.7 (1987) (stating that a prima facie case for IIED requires the above elements). Defendants AIG, Inc. ("AIG") and Chartis Claims, Inc. ("Chartis") seek dismissal of Plaintiff's IIED claim, arguing that Plaintiff fails to allege related misconduct by AIG. Defendants' motion states that the only allegations in the TAC specific to AIG are in paragraph 3, wherein Plaintiff alleges "the majority of shares in NATIONAL UNION were owned by AMERICAN INTERNATIONAL GROUP, INC.; and NATIONAL UNION was a 'member' of AIG," and in paragraph 5, where Plaintiff alleges that "Defendant AIG is a holding company for many companies, including those conducting insurance operations in the U.S., such as Defendant NATIONAL UNION, which is a 'member' of AIG. . . ." Mot. to Dismiss at 5. These Defendants also contend that the TAC does not allege any conduct on behalf of Chartis, unlawful or otherwise, besides the allegation that Deborah Paules works for Chartis. *Id.* Defendants argue that, even assuming AIG is the parent of a potentially liable defendant, Plaintiff has not sufficiently pled that AIG is liable for its subsidiary's torts. Mot. to Dismiss at 5-6. They likewise contend that Chartis cannot be held liable for the alleged misconduct of Ms. Paules. *Id.*

The Court disagrees, and finds that Plaintiff's third cause of action states an IIED claim against AIG. The complaint contains sufficient allegations that AIG is liable for the conduct of Dennis Babbits under agency principles and that Mr. Babbits contributed directly to the delay. The TAC also states an IIED claim against Chartis, for whom Deborah Paules allegedly worked and who also contributed to the delay. It bears noting that the TAC does not simply contain conclusory allegations of alter-ego liability based on the structural relationship among corporate defendants. *See generally Institute of Veterinary Pathology Inc. v. California Health Laboratories, Inc.*, 116 Cal. App. 3d 111, 119 (1981) (discussing "alter-ego" liability of a parent corporation for misconduct attributed to its subsidiary). Rather, the TAC alleges vicarious liability for acts or omissions of an agent or employee in a manner that is specific and plausible and thus sufficient under *Twombly* and *Iqbal*.

6

### 2.  Count IV: Conspiracy

Plaintiff's fourth cause of action, *i.e.,* conspiracy against AIG and Chartis, also states a claim for relief. Liability for civil conspiracy requires proof of the following elements: (1) the formation and operation of a conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct. *See Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (Cal. Ct. App. 1995). *See also Choate v. County of Orange,* 86 Cal. App. 4th 312, 333 (2000) ("civil conspiracies do not involve separate torts. The doctrine provides a remedial measure for affixing liability to all persons who have 'agreed to a common design to commit a wrong'") (quoting *Agnew v. Parks*, 172 Cal. App. 2d 756, 762 (1959)). As noted above, the TAC alleges specific conduct which purportedly constituted a larger plan or design amongst the defendants to thwart and delay Plaintiff's entitlement to benefits under the insurance policy. *See* TAC ¶ 80 (alleging that all Defendants "knowingly and willfully conspired and agreed among themselves to offer for sale, sell and provide insurance services to Tutor-Saliba and insured under the Policy" and that they agreed to "to engage in concert in the fraudulent, and wrongful tortious conduct alleged"). In fact, this Court found in its July 2010 Order Granting in Part and Denying Part Defendants' Motion to Strike and Motion to Dismiss that the earlier complaint sufficiently pled a conspiracy claim. *See* Order, July 20, 2010, at 13-14 (Docket No. 43). The TAC similarly pleads a conspiracy. Plaintiff also identifies damages that she suffered as a result. *See* TAC ¶¶ 83-86.

Defendants now argue that a conspiracy claim does not lie against those who are agents of a conspirator. This argument is without merit. First, Plaintiff pleads the conspiracy claim in the alternative, excluding the agency allegations (*i.e.*, that the defendants were acting as agents for each other) common to the other counts of the TAC. See TAC ¶ 79 (excepting Paragraphs 8, 40, and 75 (*sic*) from the incorporation paragraph).

Second, even if the defendants were acting as agents for one another, that would not preclude liability under a conspiracy claim. *Doctors' Co. v. The Superior Court of Los Angeles County*, 49 Cal.3d 39 (1989), relied upon by Defendants, only holds that a conspiracy claim does not lie against the insurer and its agents *if* the duty violated was owed solely by the insurer (and not by the agents). The California Supreme Court stated the conspiracy claim does not lie against a participant who

"was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee fo the party who did have that duty." *Id*. at 44. In *Doctors*', the claim that was the subject of the conspiracy was a violation of Insurance Code section 790.03(h)(5), which the court held imposed a duty only upon the insurance company and not upon the other defendants. *Id.* The Court noted the rule against conspiracy liability also applies to, *e.g.*, a conspiracy to violate the duty of good faith and fair dealing because that duty binds only parties to the contract (and not agents). *Id*. at 45 (citing *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 576 (1973)). In contrast, the rule against conspiracy liability does not apply to parties which "have committed another tort in their respective capacities as total strangers to the contracts of insurance." *Id*. The Court further noted that the holding "barring liability of employees or agents for conspiracy to cause their principal to violate a duty that is binding on the principal alone, will be relatively narrow where the violated duty is other than contractual." *Id*. at 48.

As an example of where liability for conspiracy would lie, the Court in *Doctors'* cited *Younan v. Equifax, Inc.*, 111 Cal.App.3d 498 (1980). As summarized in *Doctors*, the plaintiff in *Younan* alleged:

> a conspiracy among his insurer and two of the insurer's agents to deprive plaintiff of disability insurance benefits by falsely representing that plaintiff would be examined by a medical doctor who would objectively consider plaintiff's claim for benefits when in fact the examination was to be conducted by a psychiatrist who had agreed, by prearrangement with the insurer, to render a false report to provide a plausible excuse for denying the benefits. The agents were held subject to liability for conspiracy to commit actual fraud since they had a duty to abstain from injuring the plaintiff through express misrepresentation, independent of the insurer's implied covenant of good faith and fair dealing.

*Id*. at 48 (citations omitted). In distinguishing claims of conspiracy based on contract or the implied covenant from conspiracy claims based on torts, the *Younan* court observed,"The law imposes the obligation that every person is bound without contract to abstain from injuring the person or property of another, or infringing upon any of his rights. This duty is *independent* of the contract and attaches over and above the terms of the contract." 111 Cal. App. 3d at 511 (emphasis in original).

In the instant case, the conspiracy claim is based on the underlying tort of the intentional infliction of emotional distress. That tort violates a duty owed not solely by an insurer but its agents and employees as well. As in *Younan*, the conspiracy claim herein based on a tort duty independent of any contract lies against the insurer and its agents.

Defendants' reliance on *Minnesota Mutual Life Ins. Co. v. Ensley*, 174 F.3d 977 (9th Cir. 1999) to support its argument to the contrary is misplaced. *Ensley* merely held that an insurance agent not a party to the insurance contract cannot be held liable for breach of the implied covenant of good faith and fair dealing. The court there did not address the rulings of *Doctors* and *Younan*, which permit the conspiracy claim based on an independent tort.

B.     Motion to Strike

Defendants National Union, AIG, Inc., and Chartis Claims, Inc. (collectively "Defendants") ask the Court to strike three portions of the TAC. The Court addresses each in turn.

First, Defendants' motion to strike Plaintiff's inadvertent reference to AIG Domestic Claims, Inc. is unopposed and is granted.

Second, Defendants' motion to strike the additional $400,000 UIM policy proceeds is granted. Such claim was expressly released by Plaintiff in the settlement of the UIM claim. While Plaintiff contends the settlement and release were obtained under economic duress, she conceded at the hearing that the remedy for such duress is rescission. *See* Cal. Civ. Code § 1691. Plaintiff has not pled rescission, which would require her to give up the proceeds she obtained under the UIM settlement. *See Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.*, 50 Cal. 4th 913, 922 (2010) (applying § 1691 and explaining that a plaintiff seeking recision of a release must "return any consideration received as a condition of rescission before judgment in the rescission action."). Absent a claim for recision, Plaintiff's prayer for $400,000 in policy proceeds is impertinent here.

Third, Defendants' motion to strike allegations about Dr. Missirian is denied. Courts have upheld claims based on allegations that the insurance company and related entities retained doctors whom they knew and intended would provide false reports about the insured. *See Younan*, 111 Cal. App. 3d at 505; *Villa v. McFerren*, 35 Cal. App. 4th 733, 736-737 (1995) (upholding claim for

9

1  conspiracy to intentionally inflict emotional distress against insurer and doctor where insurer hired
2  doctor to examine the plaintiff and provide a biased report); *Guevara v. Allstate Insur. Co.*, 237 F.3d
3  987, 998 (9th Cir. 2001) (explaining that bad faith claims based on an insurer's allegedly biased
4  investigation may proceed where, *e.g.,* the insurer dishonestly selected an expert or failed to conduct
5  a thorough investigation); *Chateau Chamberay Homeowners Ass'n v. Assoc. Intn'l Insur. Co.*, 90
6  Cal. App. 4th 335 (2001) (same); *Bravo v. U.S. Life Insur. Co.*, 701 F. Supp. 2d 1145, 1160 (C.D.
7  Cal. 2010) ("Where there is evidence that the insurer dishonestly selected its experts or that the
8  experts were unreasonable, it is for the jury to decide whether the insurer's investigation was
9  reasonable and fair"). Here, Plaintiff alleges that Defendants paid Dr. Missirian $850-900 per hour
10 in an effort to procure a dishonest report. *See* Opp'n to Mot. to Strike at 7; TAC ¶¶ 23, 48-64, 76.
11 Such allegations regarding Dr. Missirian are relevant to Plaintiff's claims, and are not impertinent,
12 immaterial, or scandalous.

13 Finally, the Court concludes that litigation privilege of Civil Code § 47(b) does not apply to
14 the allegations about the misuse of Dr. Missirian as Defendants contend. Defendants misconstrue §
15 47(b), failing to grasp the "distinction between a cause of action based squarely on a privileged
16 communication, such as an action for defamation, and one based upon an underlying course of
17 conduct evidenced by the communication." *White v. Western Title Ins. Co.* 40 Cal.3d 870, 888
18 (1986). Although § 47(b) prohibits use of judicial communications as the basis for liability, "it does
19 not prevent their use as *evidence* of prior misconduct." Rutter Group, California Practice Guide:
20 Insurance Litigation, ¶ 12.1326 (emphasis in original).

21 In *White*, the California Supreme Court rejected the defendant insurer's argument that its
22 settlement offers, made after commencement of litigation, were absolutely privileged. The Court
23 explained that "even if liability cannot be founded upon a judicial communication, it can be proved
24 by such a communication–otherwise, Evidence Code section 1152 would be unnecessary, and much
25 of modern discovery valueless." *Id.* at 888. The Court therefore found the settlement offers to be
26 admissible to show that the insurer "was not evaluating and seeking to resolve their claim fairly and
27 in good faith." *Id. See also Westlake Community Hospital v. Superior Court*, 17 Cal.3d 465 (1976)
28 (rejecting assertion of § 47(b) where "the gist of [plaintiff's] claim is not that her injury has been

1  occasioned simply by defendants' malicious *statements* at the proceedings, and its committee
2  members in revoking her staff privileges. . . .); *Oren Royal Oaks Venture v. Greenberg, Bernhard,*
3  *Weiss & Karma, Inc.*, 42 Cal.3d 1157, 1168 (1986) ("while section 47(2) bars certain tort causes of
4  action which are predicated on a judicial statement or publication itself, the section does not create
5  an evidentiary privilege for such statements.").

6      Defendants cite no authority to the contrary, nor do they cite any case applying § 47(b) in the
7  context of a motion to strike. *See* Mot. To Strike at 8-10. Here, the statements of Dr. Missirian do
8  not constitute the basis for liability in and of themselves. Rather, they serve as evidence of
9  Defendants' allegedly wrongful conduct. Section 47(b) does not apply.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is **DENIED** and Defendants' motion to strike is **GRANTED IN PART** and **DENIED IN PART**. The reference to AIG Domestic Claims, Inc. as a defendant (TAC at 2:11-14) is stricken. Plaintiff's claim for $400,000 plus interest in additional damages under the UIM policy is likewise stricken. If Plaintiff seeks to amend her complaint to address the damages claim under the UIM policy, she shall file an amended complaint within 30 days of this Order.

This order disposes of Docket Nos. 70 and 71.

IT IS SO ORDERED.

Dated: May 2, 2011

_____
EDWARD M. CHEN
United States Magistrate Judge

11